[No. B128478. Second Dist., Div. Five. June 15, 2000.]

In re MELVIN J., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MELVIN J., Defendant and Appellant.

## COUNSEL

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Jaime L. Fuster and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WEISMAN, J.\***—On March 7, 2000, the voters approved an initiative measure designated on the ballot as Proposition 21. This measure took effect on March 8, 2000, the day following the election. (Cal. Const., art. II, § 10, subd. (a).) Proposition 21, known as the Gang Violence and Juvenile Crime Prevention Act of 1998, made numerous changes to the Penal Code and Welfare and Institutions Code relating to the adult and juvenile justice systems, including the treatment of juvenile offenders, the confidentiality protections afforded to juvenile proceedings, the type of juvenile offenders that can be tried in adult court, and the punishment for gang-related offenses and offenders. Of particular relevance to the instant case is section 27 of Proposition 21, which amended Welfare and Institutions Code section 777 by deleting the requirement of a supplemental petition when modifying a previous order to impose a more restrictive type of custody, including commitment to the California Youth Authority. Section 27 also deleted in its entirety Welfare and Institutions Code section 777, subdivision (e) which

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

had created an exception to the supplemental petition procedure where an order imposing custody had been stayed, a minor had violated a condition of the stay, and a sanction of 30 days or less in custody was imposed for the violation. In this opinion, we must decide whether the amended version of Welfare and Institutions Code section 777 contained in Proposition 21 can be applied to a hearing relating to the lifting of a stay of a Youth Authority commitment when the hearing is to be held after the effective date of Proposition 21 and when the offense for which the stayed Youth Authority commitment was imposed occurred before the effective date of Proposition 21.

On April 23, 1998, the juvenile court sustained a petition after finding true an allegation that appellant, Melvin J., was a minor who came within the provisions of Welfare and Institutions Code section 602 in that the minor was 16 years old on February 28, 1998, and committed a felony assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) on that date. At the disposition hearing held on October 23, 1998, the juvenile court found the minor to be a fit subject for the juvenile court, ordered that the minor was to remain a ward of the court, and ordered that custody be taken from the minor's parents. The juvenile court ordered the minor committed to the California Youth Authority for a period of confinement not to exceed four years. The commitment to the Youth Authority was stayed for surrender until April 23, 1999. The minor was then released and ordered to remain at home on probation on various terms and conditions. A progress report date was set for January 22, 1999.

Before the progress report date, a probation officer's report was filed on November 2, 1998, alleging that the minor had violated the conditions of probation by breaking the windows of his brother's car and also breaking windows in his mother's house. On November 2, 1998, the juvenile court ordered the minor detained until a hearing was held on the probation violation allegation. The hearing was set for November 18, 1998. The juvenile court also appointed a psychiatrist at the request of counsel for the minor and ordered a report be prepared for the hearing pursuant to Evidence Code section 730. On November 18, 1998, the juvenile court held an evidentiary hearing and found that the minor had violated the conditions of his probation as alleged by the probation officer. The juvenile court then lifted the stay of the commitment to the Youth Authority and ordered the minor to be transported to the Youth Authority.

The minor appeals from the order of November 18, 1998, lifting the stay of the commitment to the California Youth Authority. The minor contends that the juvenile court erred: (1) at the original disposition hearing on

October 23, 1998, when it failed to consider the most recent probation report prepared for that hearing; (2) at the original disposition hearing on October 23, 1998, when it stayed the commitment to the Youth Authority; (3) at the hearing on November 18, 1998, when it failed to consider the report of the psychiatrist that it had previously ordered for that hearing; and (4) on November 18, 1998, when it conducted a hearing pursuant to former[1] Welfare and Institutions Code section 777, subdivision (e) rather than pursuant to former Welfare and Institutions Code section 777, subdivision (a).[2]

We find that the minor cannot raise issues relating to the October 23, 1998 disposition hearing because he has not appealed from the orders entered at that hearing. We further find that even if these issues were properly before us on appeal, the juvenile court did not commit error when it conducted the disposition hearing on October 23, 1998, after receiving information from the court probation officer about the contents of the newest report, and that no error was committed when it stayed the commitment to the Youth Authority. We therefore affirm the dispositional order of October 23, 1998, that stayed the commitment to the Youth Authority.

As to the issues raised that relate to the hearing held on November 18, 1998, we find the court erred when it conducted the hearing pursuant to former Welfare and Institutions Code section 777, subdivision (e) and therefore failed to make the findings required by former Welfare and Institutions Code section 777, subdivision (a) before lifting the stay of the Youth Authority commitment. In analyzing whether the erroneous failure to make

---

[1]In this opinion, we will refer to the version of Welfare and Institutions Code section 777 as it read before March 8, 2000, as the "former" version.

[2]Former Welfare and Institutions Code section 777, subdivision (a) provided that when an order was sought to change the custody status of a minor by placing him in a more restrictive form of custody, including a commitment to the California Youth Authority, such a change could be made only after a noticed hearing on a supplemental petition. The court could not change the level of custody or lift a stayed commitment order unless it followed "section 777[, subdivision (a)] procedures by: (1) hearing evidence as to the efficacy of the prior disposition, (2) considering independently on the whole record whether the prior dispositional order had entirely failed, and (3) determining if a more restrictive level of confinement was necessary to the minor's rehabilitation." (*In re Jorge Q.* (1997) 54 Cal.App.4th 223, 236 [62 Cal.Rptr.2d 535].) The standard of proof at the hearing was beyond a reasonable doubt. (*In re Arthur N.* (1976) 16 Cal.3d 226, 236-241 [127 Cal.Rptr. 641, 545 P.2d 1345].) The only exception to this supplemental petition procedure occurred when a minor was to be committed to a county facility for a period of 30 days or less pursuant to a previous order imposing custody time and staying enforcement of the order subject to subsequent violations of conditions of probation. (See former Welf. & Inst. Code, § 777, subd. (e).) In order to lift a stay under former Welfare and Institutions Code section 777, subdivision (e), all that was required was for the court to find that the minor had violated a condition of probation. The court did not have to make the additional findings required by former Welfare and Institutions Code section 777, subdivision (a).

the findings required by former Welfare and Institutions Code section 777, subdivision (a) is prejudicial and justifies a remand for a new hearing, we must determine if the recent passage of Proposition 21 by the electorate on March 7, 2000, that deleted the requirement of such findings, will have any impact on any hearing on remand ordered by this court. If Proposition 21 governs any hearing conducted on remand, the juvenile court will no longer be under an obligation to make the series of findings formerly required by Welfare and Institutions Code 777, subdivision (a). Under the new provisions of Proposition 21, the juvenile court will only be required to decide if a probation violation occurred prior to ordering into effect a stayed California Youth Authority commitment. Since the juvenile court has already determined that such a violation occurred, there would be no reason to remand the case for another hearing on the same issue. We would find that any error in this regard made by the juvenile court on November 18, 1998, to be harmless given the application of the new provisions of Proposition 21 if the matter was remanded. Since the error would be harmless, no reversal would be appropriate. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) However, we determine the new provisions of Welfare and Institutions Code section 777, subdivision (a) cannot be applied on remand because to do so would violate ex post facto principles. (*Carmell v. Texas* (2000) 529 U.S. 513 [120 S.Ct. 1620, 146 L.Ed.2d 577].) Since the provisions of former Welfare and Institutions Code section 777, subdivision (a) must be utilized on remand, and since the court completely failed to make such findings, we find the error prejudicial and remand for a new hearing pursuant to former Welfare and Institutions Code section 777, subdivision (a). Because a new hearing will be held on remand, we find the remaining issue relating to the failure of the court to obtain and consider the psychiatric report ordered for the November 18, 1998, hearing to be moot.

### FACTUAL AND PROCEDURAL BACKGROUND

In October of 1996, when the minor was 15 years old, the minor was ordered into a Camp Community Placement program pursuant to a petition filed under Welfare and Institutions Code section 602. He completed the program in the fall of 1997 and was released home on probation from Camp Miller. The minor lived with his mother in Compton after his release from camp. He was a member of the Tiny Rascals gang.

On February 28, 1998, Hoang Phi Dinh and a number of his friends were leaving the Varsity Billiards pool hall. One of Mr. Dinh's friends named Ohng was a member of the Cheap Boys gang. As Mr. Dinh and his friends left the pool hall they were followed by four males who had previously been together with the minor inside the pool hall. Ohng asked the four males,

"Where you guys from?" and they responded, "TRG." Ohng said he was from "Cheap Boys." A fight then broke out between Ohng and the four males. Mr. Dinh's other friends ran away, but Mr. Dinh took a few steps toward Ohng to assist him. The minor then ran out of the pool hall with a pool cue. The pool cue was separated into two parts and the minor held one part in each hand. The minor hit Mr. Dinh in the head with the large end of the pool cue. The force of the blow caused Mr. Dinh to black out and fall down. Mr. Dinh's friend Tri Minh Tran helped him up and Mr. Dinh went back into the pool hall. The minor and Mr. Tran then began fighting. Two security guards restrained the minor and used pepper spray to get him to stop swinging the pool cue. Mr. Dinh suffered a deep cut on the top of his head that formed a scar. He suffered headaches for months following the incident and also suffered memory difficulties.

On March 3, 1998, a petition was filed pursuant to Penal Code section 602 based on the incident at the pool hall. On March 4, 1998, the juvenile court placed the minor home on house arrest in his mother's home. On March 26, 1998, the minor's mother reported that he had cut off the electronic anklet used to monitor his movement. She also reported that he was suffering a mental breakdown. The minor was admitted to Del Amo Hospital in Torrance on March 27, 1998 and was released on April 2, 1998, with instructions to continue with psychotherapy and anger management counseling. He was then transported to juvenile hall at Los Padrinos.

An adjudication hearing was held on the Welfare and Institutions Code section 602 petition and, on April 23, 1998, the juvenile court found true the allegation that the minor committed an assault with a deadly weapon on Mr. Dinh. Two other allegations relating to the minor's fight with Mr. Tran were found not true. A disposition hearing was set for April 29, 1998.

On April 29, 1998, a probation report was filed recommending that the minor be committed to the California Youth Authority. The recommendation was based on the seriousness of the offense and the fact that the minor previously had the benefit of Camp Community Placement and had not demonstrated any rehabilitation. At the disposition hearing on April 29, 1998, the juvenile court told the minor, "I'm going to send you to [the California Youth Authority]." The juvenile court noted that, "It's not going to help you but that's where I'm going to sentence you to." Then the juvenile court told the minor it would let him go home for 30 days on house arrest community detention and warned him that, "If you violate any conditions at all, any conditions, you're gone." The juvenile court then continued the disposition for a month to the date of May 27, 1998, and told the minor that he could "show" the juvenile court that he could make progress, control his

behavior, and go to school, or he could "blow it" and receive a sentence to the Youth Authority.

At the continued disposition hearing on May 27, 1998, the juvenile court indicated that the new probation report it had received that recommended a Youth Authority commitment was not the kind of a report the juvenile court wanted since it failed to address the minor's progress since the last court date. The juvenile court then addressed the minor and asked him how he was doing in school and whether he was still on house arrest. The minor's grandmother told the juvenile court that the minor was not hanging out with gang members anymore. The juvenile court decided to put the disposition hearing over for another month so it could obtain an updated thorough report from the probation department on the minor's progress in the community. The juvenile court ordered the minor to remain on house arrest community detention until the next hearing on June 26, 1998.

At the June 26, 1998 disposition hearing, a new probation report indicated that the minor "had complied with all conditions" imposed by the juvenile court. The report noted that the minor's behavior in the community and at home was satisfactory and that his behavior and attendance at school were excellent. Despite the improvement in the minor's behavior, the probation officer continued to recommend a commitment to the Youth Authority. The juvenile court decided to take the minor off of house arrest for a month to see how he behaved on home probation. The juvenile court warned the minor that he could not associate with gang members or cause problems because "you know what you're facing." The disposition hearing was reset for July 24, 1998.

At the hearing on July 24, 1998, the juvenile court stated it had not had any negative reports about the minor. The juvenile court decided to continue the disposition hearing for three months so it could keep monitoring the minor. The juvenile court stated it wanted to monitor the minor "very closely" because of the Youth Authority commitment that the People and the probation report were recommending. The hearing was continued until October 23, 1998.

At the hearing on October 23, 1998, the juvenile court noted it had not received the most recent report from the probation department. The court probation officer informed the juvenile court that the report was being forwarded to the court but had not yet been received. The court probation officer summarized what he knew of the report by informing the juvenile court that the minor was in compliance with all the terms and conditions of his probation, that there were no problems, and that the minor was still in

school. What the court probation officer did not know and did not inform the juvenile court about was that the new probation report contained a statement that "perhaps the court should grant the minor one last chance to remain in the home of his mother." The minor produced proof that his grades consisted of B's in English, social science, biology, United States history, and reading comprehension, and a C in math. The minor's mother informed the juvenile court that the minor was "doing well." The juvenile court, unaware that the new probation report noted that "perhaps" it should allow the minor to remain at home, stated that "the recommendation has always been [the California Youth Authority]" but noted that the juvenile court had given the minor a chance to prove he was capable of operating in the community. The juvenile court decided that it would impose a Youth Authority commitment but would stay the commitment and let the minor remain in the community on probation on various terms and conditions.[3] The juvenile court then ordered the minor committed to the California Youth Authority for a period not to exceed four years. The juvenile court set a surrender date for April 23, 1999, and a progress report date for January 22, 1999. The juvenile court told the minor that, "[A]s long as you continue doing like you're doing, young man, it's not going to be a problem . . . ."

On October 28, 1998, the minor's mother telephoned the probation officer and reported that the minor broke the windows of his brother's car and also broke windows in the mother's house. Based on this conduct, the probation officer filed a written report alleging that the minor violated the conditions of "home on probation" and recommending that the juvenile court impose between zero and 90 days in juvenile hall that had previously been stayed.[4]

On November 2, 1998, the matter was on calendar for hearing on the violation report that had been filed based on the incident reported on October

---

[3]Without being aware of it, the juvenile court was in fact going along with the suggestion in the new report that the minor be given one last chance to remain in the home of his mother.

[4]The probation report was incorrect when it indicated that the juvenile court had previously imposed and stayed between zero and 90 days in juvenile hall. The juvenile court had actually imposed and stayed a California Youth Authority commitment of up to four years. The minor had a surrender date set 90 days away, and this 90-day continuance of surrender may have confused the probation officer and led him to believe that the juvenile court had stayed a zero-to-90-day sentence to juvenile hall. Evidently, because the probation officer believed the case involved a violation of a home on probation condition with a possible sanction of 30 days or less in the juvenile hall, the probation officer filed the probation report alleging a violation under former Welfare and Institutions Code section 777, subdivision (e). Prior to Proposition 21, this was the proper procedure to follow in cases where 30 days or less was the sanction imposed for a violation of probation by a minor. (*In re Scott S.* (1998) 66 Cal.App.4th 1528, 1530-1531 [78 Cal.Rptr.2d 748].) Where a commitment to the California Youth Authority had been stayed, the probation officer was required to file a supplemental petition under former Welfare and Institutions Code section 777, subdivision (a) in order to have the stay lifted and the California Youth Authority commitment placed in effect. (*In re Jorge Q., supra,* 54 Cal.App.4th at pp. 236-237; *In re Chad S.* (1994) 30 Cal.App.4th 607, 612 [35 Cal.Rptr.2d 795]; *In re Kazuo G.* (1994) 22 Cal.App.4th 1, 8-10 [27 Cal.Rptr.2d 155].) Proposition 21 has

28, 1998. At the beginning of the hearing, the juvenile court noted that the matter was being handled under the provisions of Welfare and Institutions Code section 777, subdivision (e).[5] Counsel for the minor inquired if the matter was truly subject to a "777(e)" procedure. The juvenile court stated that it was indeed a "777(e)" situation. Counsel for the minor then asked the juvenile court if it would impose 30 days under "777(e)" if the minor admitted the allegation, but the juvenile court stated that "[t]he only alternative the minor has is [the California Youth Authority]." The juvenile court then noted it wanted to obtain a psychiatric report under Evidence Code section 730 relating to the mental condition of the minor, and that it intended to continue the hearing on whether to lift the stay of the California Youth Authority commitment for three weeks. When the minor protested his detention, the juvenile court reminded him that, "I put a very short rope on you . . . ." When the minor continued to protest, the juvenile court told him, "I have one option with you right now. I can send you to [the California Youth Authority] today and that's it." The juvenile court then set the matter for hearing on November 18, 1998.

On November 18, 1998, the juvenile court called the case and stated it was there "for a hearing on a 777(e) petition." Counsel for the minor indicated that while she was ready for the ordered hearing, she believed that the proper procedure for lifting a stay of a California Youth Authority commitment was to proceed under the supplemental petition procedure of Welfare and Institutions Code section 777, subdivision (a). The juvenile court reiterated that it believed the matter was there on a "777(e) petition" and that it would proceed under that provision over the minor's objection. Counsel for the minor then asked that if the "777(e)" petition was sustained, that the juvenile court impose only the 30 days allowed under Welfare and Institutions Code section 777, subdivision (e). The juvenile court then proceeded to conduct an evidentiary hearing on the alleged violation.

At the evidentiary hearing, the minor's mother testified that the minor came home in an agitated state on October 27, 1998. He was playing music on his boom box and his mother asked him to turn off the music. When the

---

deleted the requirement of a supplemental petition from Welfare and Institutions Code section 777, subdivision (a), and all that is currently required is for a notice of violation to be filed.

[5]Prior to the effective date of Proposition 21, former Welfare and Institutions Code section 777, subdivision (e) provided: "The filing of a supplemental petition and the hearing thereon shall not be required for the commitment of a minor to a county institution for a period of 30 days or less pursuant to an original or a previous order imposing a specified time in custody and staying the enforcement of the order subject to subsequent violation of a condition or conditions of probation, provided that in order to make the commitment, the court finds at a hearing that the minor has violated a condition of probation." Proposition 21 completely deleted subdivision (e) from Welfare and Institutions Code section 777.

minor did not obey, his mother took the boom box out of his hand and turned it off. The minor then went into the living room where Marquis, his 21-year-old brother, was watching television. The minor turned off the television and Marquis told his mother that the minor was bothering him. The minor's mother entered the living room and told the minor to leave his brother alone. She said she was going to call the hospital where the minor had previously been treated. The hospital had told her to call if the minor started acting up. She went to get the telephone number for the hospital. Marquis then said, "Mama, he hit me." She returned to the living room and told the minor to leave Marquis alone. The minor said, "Fuck all you guys" and then went outside.

The minor approached Marquis's car and kicked the door. When his mother told him to leave the car alone, the minor obtained a metal object shaped like a four-by-four from a neighbor's truck and used the metal object to hit the front and the windshield of Marquis's vehicle. The windshield was shattered. The minor continued to hit the car while his mother told him to stop. As his mother approached, the minor hit the passenger side window of the car. The window was completely broken out and the pieces of glass were inside the car. He then dropped the metal object and ran away.

A neighbor informed the mother that the police had been called. The minor's mother, grandmother, and brother began to clean up the area. The minor then returned and threw a brick into the rear side window of the car. The brick broke the side window. The minor then threw another brick at Marquis. When the minor's mother told him to leave Marquis alone, the minor ran away again.

The minor's mother told Marquis to get in his car and leave the area. As he drove away the minor appeared and threw a brick at the car. The minor then continued to throw bricks toward his house and toward a neighbor's house. Four bricks went into the minor's house and one brick hit the porch light. One brick broke a neighbor's window and went into the neighbor's house. The neighbor came out and said, "Man, you're not going to throw bricks at this house. Now, you might be doing this to your mom, but you're not here." When the minor's mother told him that the police were coming, the minor walked across a street, approached a church, and walked inside the church. When the police arrived they entered the church with the minor's mother and detained the minor. He was placed in custody and taken to a mental hospital.

The minor also testified at the evidentiary hearing on November 18, 1998. He explained that he was "stressed out" on October 27, 1998. He said that

his brother started the fight and explained while he broke the windows in his brother's car, he never threw a brick at his brother. He said that the day before the incident he had asked his mother to take him to the mental hospital but she refused. He said that his mother took his brother's side and spent money unfairly on Marquis.

At the conclusion of the evidentiary hearing on November 18, 1998, the juvenile court addressed the minor and stated: "Okay. Well, Melvin, you know, back in the first part of the year, you told me to give you a chance. I gave you a chance. I did everything that everybody was against. I put a very short leash on you and I told you you cannot violate any of my orders, and you did. You violated the order. You disobeyed your mother. You committed all these offenses, broke all these windows. And you were on a [California Youth Authority] stay. [¶] I'm going to find you in violation and I have to impose the California Youth Authority order. That's all I can do. So that will be my order." The juvenile court then proceeded to lift the stay of the order of October 23, 1998, and sent the minor to the California Youth Authority.

## DISCUSSION

*The Minor Is Precluded from Contesting the Validity of the Dispositional Order of October 23, 1998, Because He Did Not Appeal from That Order*

The minor contends on appeal that the dispositional order entered on October 23, 1998, is improper for two reasons. First, he contends that the juvenile court erred when it proceeded to conduct the hearing on October 23, 1998, without having received and considered the most recent probation report prepared for that hearing. Second, he contends that the juvenile court was without jurisdiction to stay an order of commitment to the California Youth Authority. We find that the minor is precluded from raising these contentions on appeal because he did not appeal from the dispositional order entered on October 23, 1998. The notice of appeal filed in this case states that the minor appealed only from the order of November 18, 1998, and the hearing conducted on that day pursuant to Welfare and Institutions Code section 777, subdivision (e). The notice of appeal does not purport to be from the order entered on October 23, 1998, and that order was separately appealable as a final disposition order. Since the minor never appealed the order of October 23, 1998, he is precluded from raising issues relating to that order. (*In re Matthew C.* (1993) 6 Cal.4th 386, 393 [24 Cal.Rptr.2d 765, 862 P.2d 765]; *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391, 1395 [49 Cal.Rptr.2d 175].)

*Even If the Notice of Appeal Is Deemed to Include the Order of October 23, 1998, the Juvenile Court Committed No Error When It Conducted the Disposition Hearing and Stayed the Commitment to the California Youth Authority*

Even if we deem the notice of appeal to encompass the dispositional order of October 23, 1998, we find the juvenile court did not err when it conducted the disposition hearing without having a physical copy of the newest probation report, and did not err when it stayed the commitment of the minor to the California Youth Authority.

The juvenile court had received a previous disposition report from the probation department on April 29, 1998. The juvenile court then received another disposition report from the probation department at the continued disposition hearing on May 27, 1998. The juvenile court received another disposition report at the continued disposition hearing on June 26, 1998. At the continued disposition hearing on October 23, 1998, the juvenile court put all parties on notice that it had not yet received the latest report, although obviously it had read the three previous reports all prepared within the last six months. The court probation officer told the juvenile court and all counsel that the report was going to be sent over and that the probation officer writing the report found the minor to be in compliance with all terms and conditions set by the juvenile court. The court probation officer reported that the minor was in school and that there were no problems. Thus, the juvenile court and all counsel were all aware of the underlying facts that would be contained in the new report and everyone was operating under the understanding that the report was favorable as far as the minor being able to comply with the terms and conditions set forth by the juvenile court in its previous release orders. Counsel for the minor did not ask to continue the proceedings until the report arrived, and evidently felt comfortable proceeding with the favorable oral report from the court probation officer. Counsel did not object in any way to the absence of a physical copy of the report, presumably because counsel knew that the juvenile court had three previous reports in addition to the oral report of the court probation officer, and because the juvenile court had continually given the minor a chance to remain out of custody and to remain at home with his mother. Obviously, counsel knew that the juvenile court was very familiar with the minor and was working closely with the minor. Since the oral report of the court probation officer was very favorable to the minor, counsel seemed anxious to proceed. Indeed, immediately after being told of the oral summary of the facts in the report, counsel asked the juvenile court to consider proof she was submitting of the good grades that the minor was achieving in school. Counsel immediately thereafter asked the juvenile court if the minor could

remain home on probation. The only additional information contained in the written report was a suggestion that "perhaps the court should grant the minor one last chance to remain in the home of his mother."

This situation is far different from the situation in *In re L. S.* (1990) 220 Cal.App.3d 1100, 1103-1107 [269 Cal.Rptr. 700], which is cited by the minor on appeal. In *In re L. S.*, the court at the disposition hearing had not handled the adjudication hearing and knew nothing about the case. There had never been a report prepared for the disposition hearing in that case and the court in that case was unaware of the minor's problems and whether any drug abuse issues existed. Here, by contrast, the juvenile court had been working closely with the minor for months in an effort to help him and had the benefit of three recent written probation reports. In addition, the juvenile court in the instant case had the benefit of an oral report on the findings of the probation officer presented to it the very day of the disposition hearing by the court probation officer.

Thus, the instant situation is not one where no report was ever prepared. It is a case where reports were continually prepared each time the disposition hearing was continued, even if it was only continued for a period of weeks. When the juvenile court in the instant case acted, it had received three written reports and one oral summary in the span of six months. The juvenile court was aware of all underlying facts at the time it acted. Moreover, the juvenile court did exactly what the probation officer suggested in the report when it gave the minor one last chance to remain in the home of his mother by staying the California Youth Authority commitment and sending the minor home following the hearing. We therefore find no error occurred when the juvenile court proceeded with the disposition hearing in this case on October 23, 1998.

█ We also find that the juvenile court had the authority to stay the commitment to the California Youth Authority. The minor relies on the decision in *In re Ronnie P.* (1992) 10 Cal.App.4th 1079, 1087-1088 [12 Cal.Rptr.2d 875], which found that there was no authority for a court to suspend or stay a commitment to the California Youth Authority. The minor recognizes that numerous cases since *Ronnie P.* have disagreed with its reasoning and have approved stayed commitment orders. (See *In re Jorge Q.*, *supra*, 54 Cal.App.4th at p. 236; *In re Chad S.*, *supra*, 30 Cal.App.4th at p. 613; *In re Kazuo G.*, *supra*, 22 Cal.App.4th at pp. 9-11.) We also choose to disagree with *Ronnie P.* and we uphold the discretion of the court in this case to impose and stay a commitment to the California Youth Authority.

*The Juvenile Court Erred When It Conducted a Hearing Relating to Lifting
the Stay of the California Youth Authority Commitment Pursuant to Former
Welfare and Institutions Code Section 777, Subdivision (e)*

The minor contends that the juvenile court erred on November 18, 1998, when it conducted a hearing on whether to lift the stay of the California Youth Authority commitment and proceeded under former Welfare and Institutions Code section 777, subdivision (e) rather than under former Welfare and Institutions Code section 777, subdivision (a). We agree that the juvenile court erred when it proceeded under former Welfare and Institutions Code section 777, subdivision (e), and therefore failed to make the findings required by former Welfare and Institutions Code section 777, subdivision (a) before lifting the stay of the commitment to the California Youth Authority.

Under former Welfare and Institutions Code section 777, subdivision (a), a court could not lift a stay of a California Youth Authority commitment unless, after the filing of a noticed supplemental petition, the court not only found that a violation had occurred, but also proceeded (1) to hold an evidentiary hearing as to the efficacy of the prior disposition, (2) considered independently on the whole record whether the prior dispositional order had entirely failed, and (3) determined if a more restrictive level of confinement was necessary for the minor's rehabilitation. (*In re Jorge Q., supra*, 54 Cal.App.4th at p. 236.) The standard of proof required was proof beyond a reasonable doubt. (*In re Arthur N., supra*, 16 Cal.3d at pp. 236-241.) In the instant case, the juvenile court held an evidentiary hearing limited to the sole issue of whether a violation of a condition of probation had occurred. The juvenile court found that a violation occurred, but did not make any additional findings before lifting the stay and placing the Youth Authority commitment into effect.

While such a procedure would have been proper to lift a stay of a commitment to a county facility and to impose a sentence of no more than 30 days as a sanction under former Welfare and Institutions Code section 777, subdivision (e), the procedure employed by the juvenile court in this case failed to comply with the more stringent requirements of former Welfare and Institutions Code section 777, subdivision (a) that had to be utilized before a stay of a California Youth Authority commitment could be lifted. (*In re Jorge Q., supra*, 54 Cal.App.4th at pp. 236-237; *In re Kazuo G., supra*, 22 Cal.App.4th at p. 11.)

In the instant case, however, the probation officer did file a written notice of violation and the juvenile court held an evidentiary hearing on the alleged

violation. Since a written violation notice was filed and a contested hearing was held on the alleged violation at which the minor was afforded his right to counsel, his right to confrontation and cross-examination, and testified on his own behalf, we find that the juvenile court's factual determination of the historical facts concerning the minor's conduct should be allowed to stand. We see absolutely no reason to order the juvenile court to rehear the testimony on the limited factual issue of whether or not a violation occurred, since any new evidentiary hearing on this limited issue would no doubt result in the same finding. In fact, the minor concedes that he is not challenging the finding of the court that he committed the acts alleged in the probation report.

■ The key issue to be decided is whether the matter should be remanded to the juvenile court for a new hearing on (1) the efficacy of the prior disposition, (2) whether the prior dispositional order had entirely failed, and (3) whether a more restrictive level of confinement is necessary for the minor's rehabilitation. If former Welfare and Institutions Code section 777, subdivision (a) governs any hearing on remand, the juvenile court will have to make the findings mandated by that section at a new hearing. If, however, the newly amended version of Welfare and Institutions Code section 777, subdivision (a), approved as part of Proposition 21, applies to any future hearing on remand we order, there are no further findings required for the juvenile court to make since it has already determined that a violation of a probation condition occurred. In that situation, any error that occurred at the original hearing would now be harmless in light of the new standard that would govern any new hearing in the case.

We must therefore determine whether the new version of Welfare and Institutions Code section 777, subdivision (a), which became effective on March 8, 2000, can be applied to a new hearing to lift a stay where the new hearing will occur after March 8, 2000, and the hearing relates to a minor who was made a ward of the court based on conduct that occurred before that date.[6] We are guided in this determination by the principles set forth by the United States Supreme Court in the recent case of *Carmell v. Texas, supra*, 529 U.S. 513. ■ In *Carmell*, the majority held that four categories of laws contravene ex post facto principles and cannot be applied to conduct that occurred prior to their effective dates. The majority catalogued the four categories as: (1) a law that makes criminal and punishes an action done before the passing of the law that was innocent when done; (2) a law

---

[6]In *Johnson v. United States* (2000) 529 U.S. 694, ___, [120 S.Ct. 1795, 1800-1801, 146 L.Ed.2d 727], the court determined that postrevocation sanctions relate to the original offense for ex post facto purposes, and not to the date of the conduct alleged to constitute the basis for the revocation.

that aggravates a crime or makes it greater than it was when it was committed; (3) a law that changes the punishment for a crime and inflicts greater punishment than provided at the time of commission; and (4) a law that alters the legal rules of evidence and receives less or different testimony than the law required at the time of commission of the offense in order to convict the offender. (*Id.* at pp. 513-514 [120 S.Ct. at pp. 1622-1623] [Rptr. of Decisions Syllabus; not part of opn.].) The majority initially recognized that prior cases such as *Collins v. Youngblood* (1990) 497 U.S. 37 [110 S.Ct. 2715, 111 L.Ed.2d 30], had been "rather cryptic" about whether the fourth category was really prohibited by ex post facto principles. The majority then concluded that the fourth category had not been "cast out" as part of the ex post facto doctrine and was still a viable category that defined a prohibited class of laws from operating retroactively. (*Carmell v. Texas, supra,* 529 U.S. at pp. 514, 537-538 [120 S.Ct. at pp. 1623 [Rptr. of Decisions Syllabus; not part of opn.], 1635].)[7] In *Carmell,* the court was presented with a Texas statute that originally required corroboration of a victim of a sexual offense if the victim was 14 years old or older at the time of the offense. The statute was amended after the date of the alleged offense to require corroboration only where the victim was 18 years old or older at the time of the offense. The victim in *Carmell* was over 14 but under 18 at the time of some of the offenses, and there was no corroboration as to those alleged offenses. The majority found that the effect of the amendment was to reduce the amount of evidence needed for a finding of guilt. The majority determined that reducing the quantum of evidence required for a conviction was unfair and unjust. The majority noted that there is a fundamental fairness interest in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty. (*Carmell v. Texas, supra,* 529 U.S. at p. 514 [120 S.Ct. at p. 1623] [Rptr. of Decisions Syllabus; not part of opn.].) The majority stated that when a prosecutor's case is insufficient and the defendant is entitled to an acquittal, to change the rules to allow less evidence in order to convict the defendant constitutes an ex post facto violation. (*Id.* at p. 530 [120 S.Ct. at p. 1631].)

    ██    Applying the fourth category to the case at bar, we find that the new version of Welfare and Institutions Code section 777, subdivision (a) deletes the requirements that the court find (1) the previous disposition has not been effective in the rehabilitation of the minor, (2) the prior dispositional order had entirely failed, and (3) a more restrictive level of confinement was necessary to the minor's rehabilitation, and also eliminates the

---

[7]In California, as in many other jurisdictions, the appellate courts had indeed interpreted *Collins*'s exclusive reference to the first three categories and its statement that the fourth category did not prohibit the application of new evidentiary rules, to mean that ex post facto principles were violated only by laws comprising the first three categories. (See *People v. Frazer* (1999) 21 Cal.4th 737, 756 [88 Cal.Rptr.2d 312, 982 P.2d 180], cert. den. (2000) __ U.S. __ [120 S.Ct. 1960, 146 L.Ed.2d 792]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 293-299 [279 Cal.Rptr. 592, 807 P.2d 434].)

standard of beyond a reasonable doubt. By deleting the requirement for evidence to sustain each of these findings and allowing a commitment to the Youth Authority on less and different evidence than previously required, we find that the amended version of Welfare and Institutions Code section 777, subdivision (a), violates the fourth category of ex post facto laws and cannot be utilized by the court on remand in this case.[8]

The Attorney General asserts that the changes in Welfare and Institutions Code section 777, subdivision (a) do not contravene the fourth category discussed in *Carmell*. The Attorney General argues that ex post facto prohibitions only apply to laws that retroactively affect criminal cases and have no application to a juvenile case where the central concern is correction and rehabilitation rather than punishment. The Attorney General cites primarily to *In re Myresheia W.* (1998) 61 Cal.App.4th 734, 736-741 [72 Cal.Rptr.2d 65], wherein the court found that minors have no right to a jury trial in proceedings under Welfare and Institutions Code section 602 because the juvenile court system is different from the adult court system and its purpose is rehabilitative rather than punitive. (61 Cal.App.4th at p. 740.) The Attorney General reasons that if the right to jury trial is not applicable to juvenile proceedings, then ex post facto protections are likewise inapplicable.

The argument of the Attorney General ignores the import of *In re Gault* (1967) 387 U.S. 1, 30-31 [87 S.Ct. 1428, 1445, 18 L.Ed.2d 527], in which the United States Supreme Court held that the due process clause of the Fourteenth Amendment afforded certain rights to minors, including the right to adequate notice, the right to counsel, the privilege against self-incrimination, and the right of confrontation. Also, in *In re Winship* (1970) 397 U.S. 358, 364-368 [90 S.Ct. 1068, 1072-1075, 25 L.Ed.2d 368], the court held that due process requires proof beyond a reasonable doubt at the adjudicatory phase of juvenile proceedings. Further, in *Breed v. Jones* (1975) 421 U.S. 519, 528-530 [95 S.Ct. 1779, 1785-1786, 44 L.Ed.2d 346], the court emphasized that while juvenile cases do involve considerations that distinguish them from adult criminal cases, they are nevertheless "essentially criminal" proceedings to which constitutional guarantees associated with criminal prosecutions apply. The court noted that a delinquency proceeding where the issue is whether the child will be subjected to a loss of liberty for years is comparable to a felony prosecution. (*Id.* at p. 530 [95 S.Ct. at p. 1786].) The *Breed* court therefore held that double jeopardy protections attached to the adjudication phase of a juvenile proceeding. (*Ibid.*)

---

[8]The majority in *Carmell* recognized that mere changes in normal rules of evidence that do not change (1) ingredients of an offense, (2) ultimate facts required for a finding of guilt, or (3) the quantum of evidence necessary for a finding of guilt, do not contravene ex post facto principles. (*Carmell v. Texas, supra,* 529 U.S. at pp. 540-545 [120 S.Ct. at pp. 1637-1639].)

In *Carmell*, the majority emphasized that changing the number of elements (or findings) required to convict, or reducing the amount of evidence required to convict, are examples of instances where "the government refuses, after the fact, to play by its own rules, altering them in a way that is advantageous only to the State, to facilitate an easier conviction." (*Carmell v. Texas, supra*, 529 U.S. at p. 514 [120 S.Ct. at p. 1623] [Rptr. of Decisions Syllabus; not part of opn.].) The court then stated "[t]here is plainly a fundamental fairness interest, even apart from any claim of reliance or notice, in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life." (*Id.* at p. 533 [120 S.Ct. at p. 1633].) In finding that the fourth category of laws, namely, those that alter legal rules of evidence and receive less evidence than previously required for conviction, violates ex post facto principles, the majority in *Carmell* concluded by noting that " ' "[t]he escape of one delinquent can never produce so much harm to the community, as may arise from the infraction of [the ex post facto clause] upon which the purity of public justice, and the existence of civil liberty, essentially depend." ' " (*Id.* at p. 553 [120 S.Ct. at p. 1643].) We conclude that the fundamental fairness interest protected by ex post facto principles mandates their application to juvenile proceedings which can indeed lead to the loss of liberty for years. We thus follow the reasoning of *Breed, Gault*, and *Winship*, in determining that ex post facto principles are applicable to juvenile proceedings. Our ruling is also consistent with other California cases that have previously found ex post facto prohibitions applicable to juvenile proceedings. (See *In re Dennis C.* (1980) 104 Cal.App.3d 16, 20-22 [163 Cal.Rptr. 496]; *In re Valenzuela* (1969) 275 Cal.App.2d 483, 486-488 [79 Cal.Rptr. 760].)

As we noted earlier in this opinion, the juvenile court has already determined at a full and fair contested evidentiary hearing held on November 18, 1998, that a violation of a court order occurred that constituted a violation of probation and the minor concedes that he is not challenging the finding that he engaged in the conduct alleged in the probation report. This finding may stand on remand. However, the failure of the court to make the other findings required by former Welfare and Institutions Code section 777, subdivision (a) is prejudicial, and the matter must be remanded for a hearing where the court can make appropriate findings under former Welfare and Institutions Code section 777, subdivision (a).

Since a new hearing will be conducted pursuant to former Welfare and Institutions Code section 777, subdivision (a), the psychiatric report previously ordered can be obtained for use at that hearing. If counsel wants a new report, one can be requested. Thus, the minor's remaining contention that the court erred by failing to obtain and consider the psychiatric report at the hearing on November 18, 1998, is moot.

## DISPOSITION

The dispositional order of October 23, 1998, that stayed a commitment to the California Youth Authority is affirmed. The subsequent order of November 18, 1998, lifting the stay of the California Youth Authority commitment and ordering the commitment into effect is reversed. The court is ordered on remand to conduct further proceeding and to make additional findings utilizing the provisions of former Welfare and Institutions Code section 777, subdivision (a), to determine whether the stay should be lifted.

Turner, P. J., and Armstrong, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 27, 2000. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.